IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDRE COMBS,<br><br>            Petitioner,<br><br>   vs.<br><br>RON BARNES, Warden,<br><br>            Respondent. | No. C 09-2643 LHK (PR)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The Court ordered Respondent to show cause why the petition should not be granted.[1]  Respondent has filed an answer addressing the merits of the petition.  Petitioner has filed a traverse.  Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claim presented and denies the petition.

///

///

---

[1] The Court granted Respondent's motion to dismiss the petition as a mixed petition, and required Petitioner to elect how he wished to resolve the issue of the unexhausted claim in his petition.  (*See* Docket No. 9.)  After Petitioner filed notice that he wished to proceed on the sole exhausted claim, the Court dismissed the unexhausted claim and ordered Respondent to show cause why the petition should not be granted as to the remaining claim.  (*See* Docket No. 13.)

## PROCEDURAL HISTORY

Petitioner was sentenced to fifteen years-to-life in state prison after his conviction for second degree murder in San Mateo County Superior Court. Petitioner filed a direct appeal to the California Court of Appeal, which affirmed the conviction and judgment, and a subsequent petition for review in the California Supreme Court, which denied the petition. Petitioner did not file any state habeas petitions. The instant federal petition was filed on June 14, 2009.

## BACKGROUND[2]

> In the fall of 2004, defendant was sent to live with his aunt Kimberly Johnson. Prior to that time, he had spent a year in the custody of the juvenile court system after getting into fights with his mother, Erica Ulshoeffer, and his cousin.
>
> On January 14, 2005, Stacy Ardoin, a friend of Kimberly's, [FN1] was visiting when Kimberly and the defendant got into an argument. Kimberly was yelling at defendant because he had been suspended from school. She yelled to defendant, "Bring your ass out of the room and come take out this garbage right now." Defendant was not yelling and did not become physically aggressive with Kimberly. He took out the garbage and returned to his room. Kimberly continued to yell loudly at defendant and demanded, "Come back out, bring your ass out here and wash these damn dishes." Defendant did not respond, but did wash the dishes. Ardoin left the house around noon. Later that day, she tried to contact Kimberly by phone, but was unable to reach her. On January 17, after trying unsuccessfully to reach Kimberly by telephone for several days, Ardoin went by her house. Kimberly did not answer the door and Ardoin noticed that Kimberly's Ford Taurus was not in the driveway.
>
>> FN1. We shall refer to Kimberly Johnson and certain others by their first names to be consistent with the names used throughout the record and the appellate briefs.
>
> Towards the end of [ ] January, defendant called his mother and told her he was moving to San Francisco to live with his father. At that time, it had been several weeks since Erica had spoken to Kimberly. On January 27, after trying unsuccessfully to contact Kimberly for a number of days, Erica called the police. The police drove by the house that day, and again the next day, but did not locate Kimberly. On January 28, Erica picked up defendant and his father and went to Kimberly's house to look for her. Kimberly did not answer the doorbell. Defendant and his father went around the back of the house but reported that the windows were locked so they could not get in. They left without entering the house.

---

[2] The facts of this case are taken from the California Court of Appeal opinion in *People v. Combs*, No. A116180 (Cal. App. 1 Dist. Mar. 17, 2008). (Pet. Ex. 1 ("Op"); Ans. Ex. F.)

Order Denying Petition for Writ of Habeas Corpus; Denying COA
Combs643hcden.hhl.wpd         2

On February 3, Erica entered Kimberly's house with other family members. When they began moving the furniture in the bedroom, they saw blood and glass on the floor. They called the police immediately.

The police investigated and discovered Kimberly's body wrapped in a carpet and placed behind the carport beneath two mattresses. There were cuts on both of her hands, two stab wounds and glass in her scalp, and several slashing wounds on her neck. A knife blade remained in the wound in her head. There were also blood on the soles of the socks found on the body. The doctor who performed the autopsy testified that [ ] her head had apparently been pulled back when her throat was cut. The slashing wound caused massive structural damage and blood loss.

Officers found the house in disarray. There was broken glass and blood on the carpet in the bedroom and on the bed. There were blood stains on the walls and a trail of blood led from the master bedroom through the living room to the kitchen and into the backyard. In the bathroom trash, officers found part of large blood stained broken bottle and a blood stained towel. More parts of the glass bottle, another blood stained towel, a bloody pair of shorts, and bloody T-shirt were found in a different garbage can.

A San Mateo County criminalist testified that the evidence was consistent with a bloody struggle in the bedroom, and dragging the body into the backyard. The blood on the soles of Kimberly's socks led the witness to believe that Kimberly had stepped in blood during the struggle. She also believed there was evidence of some effort to clean the mess. Bottles of beach and a carpet cleaner were found in the house. There were bleach spots in the living room carpet, including one in the shape of a foot.

An expert testified that many of the blood stains matched Kimberly's DNA. Defendant's DNA was found on the blood stains on the broken bottle, the walls, the towels and the shorts. Defendant's fingerprint was found on the broken bottle and the carpet cleaner.

On February 4, Erica brought defendant to the police station, where he was arrested for Kimberly's murder. Defendant initially denied killing Kimberly. He told the police that Kimberly was angry when he was suspended from school and yelled at him to clean the house. When he awoke the next morning, Kimberly had disappeared. After she was gone for a few days or weeks, he took her car and went to visit his father in San Francisco.

Shortly after giving his first statement to the police, defendant gave a second statement in which he admitted killing Kimberly. Kimberly was drunk and started yelling at him. She was saying, "I'm gonna kill you and stuff like that." He explained, "She says this every day of the week to me. I'm like, the first time she says it well it passes. But then I'm really startin' to think that hey, this lady is really going to kill you for no reason." As they were arguing, Kimberly hit him on the head with a Carlos Rossi bottle. He pushed her away and backed up. "[T]hat's when she really got angry like, mother fucker, just saying all this stuff, like mother fucker, I'm gonna kill you, gonna kill you, woo woo woo. And then she really was, I'm really thinkin' she was gonna kill me that time. 'Cause that's the only time she ever did somethin' like that, never hit me like that. I never hit her. She always talkin' like she's gonna kill me but I'm just lettin' it slide because I know how she is." When she charged him with the bottle, he grabbed a kitchen knife from the dresser and stabbed

her in the back and head. The knife stayed in but she was not dead. She was trying to get him with the broken bottle so he cut her neck with the bottle. When she fell on the floor he left the room because he "didn't want to see what happened." Defendant claimed, "It was like I had no other choice."

Defendant testified at trial. He explained that he was sent to live with Kimberly without warning. He said that she repeatedly threatened defendant that if he did not do his chores she would "hurt me, kick my ass, kick me out on the streets." She told him his mother did not care for him and that "this was [his] last stop." Kimberly had a machete in the house and told him, "I will use this mother fucker." Defendant thought Kimberly was tough and knew that she got into fights. When defendant got into a fight at school Kimberly was happy that he stood up for himself. Defendant was taking medication for his attention deficit disorder, but Kimberly took his medication away and yelled at him if he asked for it.

Defendant was suspended from school in January because he got into a fight. He testified that he did not remember arguing with Kimberly about his suspension. However, in the middle of the night, she came to his room and woke him. She accused him of stealing her drugs and wanted him to wash the dishes. Defendant told her he was "frustrated" and "tired of everything." Kimberly was yelling at him and saying "this is it." Defendant believed she meant that this was the end of his life. She grabbed him and tried to strangle him. She charged him with the glass bottle and hit him on the head. Defendant grabbed a knife that was on the dresser and swung it at her. He could not remember how many times he stabbed her. He grabbed a different knife from Kimberly's hand and used that knife to cut her throat. Once she was dead, he dragged Kimberly's body outside and cleaned up around the house. When the sun came up, he took some money from Kimberly's purse, the keys to the Taurus and went to a friend's house.

The defense called several witnesses to testify to Kimberly's violent character. Wanda Fay Milligan had known Kimberly for 10 to 12 years and opined that she had a reputation for "[g]oing for bad, like whatever a person is out there, want to chuck them up all the time, want to fight all the time." In 2003 and 2004, she and Kimberly shared an apartment. While the living arrangement started out acceptably, Milligan testified that "After a while it got out of hand. She started getting physical with me... If I tried to defend myself she is quite quick, quite quick and wants to hit me." Kimberly threatened her with a knife on two occasions and a bottle on another, once saying "I will cut your throat." Milligan explained that Kimberly liked to fight like a man. "[S]he don't go for all that scratching and stuff, she wants to box, grab some kind of weapon, you know, use it on you." Milligan admitted that she suffered from a mental illness and hallucinations. She was previously convicted of assault with a deadly weapon.

Redwood Police Officer Dan Smith testified that in 1995 he responded to a domestic violence call involving Kimberly and her ex-boyfriend. At that time, the ex-boyfriend reported that Kimberly had attempted to stab him. Milligan and her mother both testified that Kimberly and her ex-boyfriend often engaged in physical altercations.

Mariama Payne is defendant's cousin. She lived with Kimberly for three months and found her to be very loud and intimidating. Although Kimberly was never physically abusive with her, she saw Kimberly hit her ex-

boyfriend and threaten him with a weapon.

The defense also played a series of tape recorded phone calls between Kimberly and her boyfriend in which Kimberly said that she took defendant's pills away and planned to take him to the boys' camp run by the juvenile court system. She threatened to cut his head off and to "beat the hell out of [the boy]."

In rebuttal, the prosecution offered testimony regarding defendant's violent character. Defendant's cousin testified about being hit in the head by defendant with a frying pan. Defendant's step-father testified to observing a fight between defendant and his mother. One of defendant's teachers testified to the fight that led to defendant's suspension in January 2005, in which defendant pounded the other student's head into the floor. Another teacher testified to an earlier fight in which defendant hit the other student twice in the face. Employees at the juvenile dependency facility where defendant was being held awaiting his trial reported that defendant had been involved in numerous fights. Defendant was being held in isolation 23 hours a day. Another employee testified that she overheard defendant discussing with another juvenile an escape plan that involved taking a hostage.

In closing arguments, the prosecutor argued that defendant was guilty of first degree murder. He urged the jury to reject defendant's claim of self defense based on the number and severity of Kimberly's wounds which were inconsistent with the claim that the immediate use of deadly force was necessary. He argued that "if he honestly believed that he was acting in self-defense during stab wounds 1 through 20, and then he realized,... I'm winning this fight,... I feel like a big man, winning this fight... he's then motivated by something other than the honest belief to protect himself, well then imperfect self-defense doesn't apply." The prosecutor also suggested that if what started as a verbal altercation got out of hand and the defendant thought, "I stabbed this woman all these times, I got to take care of this, I got to finish this, I can't have her tell the police what I just did, then it's not imperfect self-defense, it's murder." He argued that defendant premeditated and deliberated Kimberly's murder during the time between stabbing her twice in the back of the head and taking the broken bottle and inflicting the fatal wound to her neck.

The defense argued that Kimberly was a "violent and unstable person" who died in a violent confrontation and that defendant reasonably, or even unreasonably, believed he was in imminent danger of being killed. He argued that the forensic evidence, including blood on the walls and carpets and on Kimberly's feet, supported his claim that there was a violent struggle in which Kimberly kept fighting with him until the end.

The jury found defendant guilty of second degree murder and also found true the allegation that he used a knife in the commission of the crime. Defendant was sentenced to a term of 15 years to life in prison. Defendant filed a timely notice of appeal.

(Op. at 2-7.)

///

1  ///

2  ///

3  **DISCUSSION**

4  A.     Standard of Review

5  　　　This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).   The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

　　　"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

　　　In determining whether the state court's decision is contrary to, or involved an

unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Here, that decision is the opinion of the California Court of Appeal.

B.  Petitioner's Claim

At trial, the Plaintiff sought to have two psychiatric experts, Dr. Catherine Ann Reed and Dr. Jeffery Gould, testify that the victim had a personality disorder that made it more likely she attacked Petitioner before he killed her. (Op. at 8.)  Dr. Reed was a psychiatrist who had diagnosed the victim with a personality disorder while treating her in 2002 and 2003. (*Id.*)  Dr. Gould was an expert witness in the field of psychiatric disorders and was to give general testimony about psychiatric disorders. (*Id.* at 9.)  The trial court excluded their testimony as irrelevant because the offer of proof indicated that the victim only had an "irascible personality," not that she was often violent. (Ans. at 5.)  The trial court also found that the testimony was prejudicial because it would consume an undue amount of time and was likely to confuse the jury with speculation about what the victim could have done.

Petitioner's sole claim in this habeas action is that he was deprived of his constitutional right to present a defense by the exclusion of evidence regarding the victim's mental illness. (Pet. Attach. at 1.)  Petitioner claims that the victim's particular mental illness was relevant to his defense "that he had a real but unreasonable belief that Kimberly intended to kill him." (Pet., Ex. One, Pet. for Review at 10.)  Petitioner claims that the trial court therefore erred when it excluded expert testimony regarding the victim's diagnosed personality disorder. (Pet. Attach. at 1.)

Whether grounded in the Sixth Amendment's guarantee of compulsory process or in the more general Fifth Amendment guarantee of due process, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683 690 (1986)); *see California v. Trombetta*, 467 U.S. 479, 485 (1984) (due process); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (compulsory process).

The right to present a defense also "includes, 'at a minimum . . . the right to put before a jury evidence that might influence the determination of guilt'" *United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). Thus, the erroneous exclusion of critical, corroborative defense evidence violates the right to present a defense. *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing *Chambers*, 410 U.S. at 294, and *Washington v. Texas*, 388 U.S. 14, 18-19 (1967)); *see, e.g., United States v. Sandoval-Mendoza*, 472 F.3d 645, 655-56 (9th Cir. 2006) (direct review; where credible, qualified medical experts disagreed about whether the defendant's medical condition made him susceptible to suggestion, the trial court's exclusion of the expert witnesses' conflicting testimony deprived the defendant of his right to present an entrapment defense, warranting a new trial)8; *United States v. Boulware*, 384 F.3d 794, 808-09 (9th Cir. 2004) (direct review; exclusion of a state court judgment that directly supported defense to the tax charges and directly contradicted the government's theory of the case that defendant had stolen money from his closely-held corporation and gifted it to his girlfriend violated defendant's due process right to present a defense and error was not harmless beyond a reasonable doubt). The exclusion of relevant evidence pursuant to the <u>correct</u> application of an evidentiary rule may also violate the constitutional right to present a defense. *Stever*, 603 F.3d at 755-56; *see Lunbery v. Hornbeam*, 605 F.3d 754, 761-62 (9th Cir. 2010) (finding California's application of its evidentiary rules to exclude hearsay testimony that bore persuasive assurances of trustworthiness and was critical to the defense violated right to present evidence).

To determine if the exclusion of evidence violated the defendant's right to present a defense, whether the exclusion was pursuant to a correct or erroneous application of the evidentiary rules, the court considers the following factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Stever*, 603 F.3d at 755-56 (quoting *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)). This standard is "more forgiving" where the evidence was "erroneously excluded on purely evidentiary principles" because there is a

legitimate state justification for it. *Id.*

The United States Supreme Court has also left open the question whether the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact. *See Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009). Thus, while, under Ninth Circuit precedent, it is "well established . . . that expert testimony concerning an ultimate issue is not per se improper," *id.* (quotation and citation omitted), for purposes of habeas corpus review it suffices to determine that no Supreme Court case has squarely addressed the issue and, therefore, a state appellate court's decision affirming the admission of such testimony is not contrary to or an unreasonable application of clearly established Supreme Court precedent under 28 U.S.C. § 2254(d)(1). *See id.* at 761-62; *see, e.g., Briceno v. Scriber*, 555 F.3d 1069, 1078 (9th Cir. 2009) (habeas relief not available under § 2254(d) for claim that expert's opinion testimony as to whether hypothetical robberies would have been gang-related should have been excluded because it pertained to the ultimate issue for the jury); *Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (habeas relief not available under § 2254(d) for claim that expert testimony to show improper interrogation methods should have been admitted because Supreme Court has not squarely addressed the issue; citing *Moses*, 555 F.3d at 758-59).

The California Court of Appeal reviewed the trial court's ruling for abuse of discretion, and found the expert testimony was properly excluded. Petitioner argued that Dr. Reed's proffered testimony was relevant to "'explain to the jury Kimberly's mental state, her penchant for using implicit or express threats of violence to get her way, and how people with Kimberly's mental health conditions present themselves to the world around them.'" (Op. at 9-10.) In addition, Petitioner argued that Dr. Gould's testimony was "'important to explain to the average juror... what mentally ill people are like to deal with' and 'relevant to rebut the prosecutor's contention that [defendant] killed Kimberly in an entirely unprovoked attack.'" (*Id.* at 10.) The Court of Appeal rejected Petitioner's arguments, and concluded that the error was harmless.

> The trial court excluded the expert testimony on the grounds that it was irrelevant under section 1103 and more prejudicial than probative under section 352. The court found that much of Dr. Reed's testimony regarding

Kimberly's mental health history and all of Dr. Gould's testimony regarding personality disorders in general were irrelevant because "the focus [in this case] is not on the victim in terms of the victim's character for anything else other than violence, it's not the fact that she may have been harassible, it's not the fact that she may be the most miserable person on the face of the planet in getting along with or in terms of being harassing, demeaning or anything else... The focus here is on violence." While the court initially indicated that Dr. Reed might be allowed to "recount any incidents that she had in terms of her interactions with [Kimberly] in terms of violence," after the section 402 hearing the court excluded all of Dr. Reed's testimony on the grounds that there was "no specific and singular incident to which Dr. Reed testified... as it relates to any incident of violence or any direct threats which... meet the criteria as being sufficiently reliable for them to be admitted into evidence...."

We review the trial court's ruling for abuse of discretion (*People v. Cox* (2003) 30 Cal.4th 916, 955) and cannot say that the court abused its discretion in this case. The court considered that much of Dr. Reed's testimony was irrelevant under section 1103 because it related to the victim's character or propensity for unpleasant behavior, but not necessarily for violence. As the court explained, the fact that Kimberly may have been "the most miserable person on the face of the planet in [terms of] getting along with or in terms of being harassing, demeaning or anything else" is not relevant to the critical issue in this case - whether she had a propensity of violence of such severity as to cause one to believe that he or she was in imminent danger of being killed or suffering great bodily injury that could be avoided only by the immediate use of deadly force (see CALJIC No. 505). Likewise, with regard to Dr. Gould, the court explained that "his beliefs or opinions as it relates to debilitating conditions associated with borderline personality disorder or schizophrenia, the fact that they may worsen over time, the fact that he's reviewed histories, that he has talked to people who have had interplays with her, I don't see that as being relevant and material here." Even if the proffered testimony had any relevance to the issue being tried, it was plainly marginal. The testimony concerning Kimberly's diagnosis at the section 402 hearing was far short of showing that she was likely to behave in a manner that would make it appear that she was about to kill or cause great bodily injury to another.

Defendant relies heavily on Dr. Reed's proffered testimony that she was afraid for her safety when Kimberly slammed her fist on her desk. He argues, "Most important, the fact that Dr. Reed herself, was intimidated and frightened by Kimberly was very illuminating in regard to the issue of whether appellant actually feared for his safety.... If Dr. Reed, a person experienced with dealing with people with mental problems feared for her personal safety, that fact was strong circumstantial evidence that appellant actually feared for his safety when confronted by the same person engaging in very similar behavior." Defendant suggests that Dr. Reed's testimony shows "that Kimberly had a character trait, i.e., mental illness [that] led her to resort to threats and intimidation to get her way." However, while Dr. Reed indicated that Kimberly's outburst caused her to be concerned for her safety, she did not testify that the behavior was so extreme as to indicate Kimberly was about to kill or severely injure her, nor did she offer to testify that her condition made such behavior likely. As the trial court noted, Kimberly's angry outburst came "[a]t one point when she wasn't getting what she wanted." Kimberly did not threaten Dr. Reed with violence to obtain the desired social services, she threatened to sue her. Dr. Reed's testimony shed little light on whether Kimberly behaved in such a threatening manner on the

night of her killing that defendant feared for his life.

As against the limited relevance of the proffered testimony, there were substantial countervailing factors that the court properly considered in exercising its discretion under section 352. The court found that the admission of this evidence would necessitate undue consumption of time and likely confuse the relevant issues. The court was concerned that if this evidence was admitted a "similar analysis of [defendant's] diagnosis" would be permissible and then "under a 352 analysis, the focus would not be on what occurred in this case, but on all of these extenuated psychiatric issues." Moreover, the limited evidence proffered by Dr. Reed regarding a single angry outburst in which Kimberly slammed her fist on a table was at best duplicative of the substantial evidence that was admitted regarding Kimberly's prior violent behavior, threats of violence and reputation for violence. In view of the undisputed evidence of Kimberly's explosive personality, the court was certainly justified in concluding that the proffered expert testimony concerning her psychiatric diagnosis would be a time-consuming diversion that would be of little if any value in determining the events that precipitated her killing. The court did not abuse its discretion in excluding this testimony.

(Op. at 10-12.)

Petitioner has not demonstrated that the California Court of Appeal's conclusion was unreasonable. *See Fry v. Pliler*, 551 U.S. 112, 119 (2007) ("[A] federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable."). Here, Petitioner presents no evidence that the state trial court incorrectly applied or disregarded its own evidentiary rules and thereby abused its discretion. The Court of Appeal found that the record indicated that the trial court properly considered the relevance of the expert testimony under Evidence Code § 1103[3] and exercised its discretion under § 352[4] before excluding the

---

[3] According to the Court of Appeal: "Absent specified exceptions, character evidence is generally inadmissible to prove conduct on a particular occasion. (Evid. Code, § 1101, subd. (a).) Section 1103 creates such an exception, providing that evidence of a crime victim's character is not inadmissible when offered by the defendant to prove the conduct of the victim in conformity with the character or trait of character." (Op. at 7.)

"Section 1103, subdivision (a) provides in relevant part, 'In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character.'" (*Id.*, n. 3.) The admission of such character evidence is still subject to the court's discretion under § 352. (*Id.* at 8.)

[4] The Court of Appeal provides the following: "Section 352 provides, 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create

testimony. *See supra* at 10.

Furthermore, Petitioner fails to show that the exclusion of the expert testimony violated his right to present a defense under the *Stever* factors: (1) the expert testimony had little probative value on the central issue, *i.e.*, the victim's propensity for violence; (2) the evidence would be time-consuming and likely confuse the relevant issues to the jury who would likely focus "not on what occurred in this case, but on all of these extenuated psychiatric issues," (Op. at 12); (3) the expert testimony was not the sole evidence on whether Petitioner acted in self-defense, but rather was "marginal," (*id.* at 11); and (4) the evidence was not a major part of his defense as Petitioner was still able to argue self-defense and present other evidence relevant to the victim's violent character, (*id.* at 11). *Stever*, 603 F.3d at 755-56. Even assuming that the evidence was reliable, the other four factors do not weigh in Petitioner's favor, especially where there was clearly legitimate state justification for the exclusion of the expert testimony. *Id.*

The jury rejected Petitioner's self-defense argument and found him guilty of second degree murder based on overwhelming evidence to the contrary, including the physical evidence that showed the victim was stabbed multiple times, including two stabs in the back, with a fatal wound to her neck with a broken bottle. *See supra* at 5. Even if the expert testimony had been admitted, it is a reasonable determination to conclude that a jury would still have rejected Plaintiff's self-defense argument, particularly in light of the number and severity of the wounds to the victim's body belying the need for deadly force, Petitioner's inconsistent testimony, and the evidence of Petitioner's own violent nature. *See Fry*, 551 U.S. at 119. Lastly, even if the Court of Appeal's conclusion that the error was harmless was a close call, Petitioner is still not entitled to federal habeas relief because under Ninth Circuit precedent, a state appellate court's decision on the admission (or exclusion) of expert testimony is not contrary to or an unreasonable application of clearly established Supreme Court precedent under AEDPA as the Supreme Court has not squarely addressed the issue. *See Moses*, 555 F.3d at 761-62; *Horell*, 644 F.3d at 983.

---

substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (Op. at 8, n. 4.)

1    Accordingly, the California Court of Appeal's conclusion that the exclusion of expert testimony was harmless was not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

///

## CONCLUSION

For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: 12/6/11

LUCY H. KOH
United States District Judge